### THE UNITED STATES COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**KAILI ALEXIS SMITH,**

     Plaintiff,                                CASE:

v

**FLORIDA HIGHWAY PATROL**, a division of
the Florida State Department of Highway Safety and
Motor Vehicles, **ELIAS SANCHEZ, XAVIER
ECHEVERRIA**, and **MICHAEL ELLIS**.

     Defendants.

_____//

# COMPLAINT

*KAILI ALEXIS SMITH*, by and through her undersigned trial counsel, sues the *FLORIDA HIGHWAY PATROL* (a division of the Florida State Department of Highway Safety and Motor Vehicles) ("*FHP*"), ELIAS SANCHEZ, XAVIER ECHEVERRIA, and MICHAEL ELLIS and alleges the following:

## JURISDICTION AND VENUE

1.    This Court has original jurisdiction pursuant to 28 U.S.C. §,1331 over several federal claims asserted in this Complaint as they seek relief under the laws of the United States. Jurisdiction is also conferred pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 12132 because certain claims brought by Kaili Smith arose under the Civil Rights Act and the Americans with Disabilities Act (the "*ADA*")

2.      This court has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367, as the state law claims share all common operative facts with the federal law claims, and the parties are identical.  Resolving all state and federal claims in a single action serves the interests of judicial economy and fairness.

3.      Venue is proper based on 28 U.S.C. § 1391 because the acts giving rise to the claims presented in this lawsuit occurred within the boundaries of this District.

## THE DEFENDANTS / OTHER ACTORS

4.      Florida Highway Patrol ("FHP") is a division of the Florida Department of Highway Safety and Motor Vehicles, primary law enforcement agency charged with investigating traffic crashes and criminal laws on the state's highways.  FHP differs from most state agencies in the United States as it is not considered a State Police.

5.      David Carter ("*Carter*") is an individual that, at all times material hereto, was employed by FHP in Tallahassee, FL. At this time, Carter is not a named Defendant in this litigation.

6.      Elias Sanchez ("*Sanchez*") is an individual that, at all times material hereto, was employed by FHP and was one of the individuals that supervised Kaili Smith.

7.      Xavier Echeverria ("*Echeverria*") is an individual that, at all times material hereto, was employed by FHP and was one of the individuals that worked

with Kaili Smith; Echeverria was also in a romantic but abusive relationship with Smith during the times relevant to the issues raised in this pleading.

8.      Michael Ellis ("*Ellis*") is an individual that, at all times material hereto, was employed by FHP and was one of the individuals that supervised Xavier Echeverria and had certain oversight over the Plaintiff.

9.      At all times and places described herein, the actions and/or inactions of FHP were undertaken, and/or not undertaken, by individuals who were the employees or agents of FHP, each of whom were, at the time acting, within the course and scope of their employment. As a result, FHP is directly liable, or vicariously liable for said actions and/or inactions

**THE PLAINTIFF**

10.     Kaili Alexis Smith is an individual that resides in the City of Orlando, which is in Orange County, Florida.  Ms. Smith is a former employee of FHP who was wrongfully terminated by FHP.

11.     Ms. Smith had a dream, growing up, of pursuing a career in law enforcement, and had a particular passion to work for FHP, which is one of the reasons that she relocated from Indiana to Florida.

12.     Ms. Smith's passion prompted her to apply to the Florida Highway Patrol Training Academy (the "*Academy*") in 2019; she was 20 years old at the time and in excellent health.

13.     Completing the Academy's training program was the only means for Ms. Smith to achieve her objective; the application process for the Academy was rigorous, intrusive and took approximately six months to complete.

14.     Part of the application process required unfettered access to the trainee's medical records and a robust physical examination to ensure that the candidate could meet the required physical, mental and health requirements.

15.     FHP makes the following statement about its training of recruits:

> **Paid Training**: New Troopers receive 28-29 weeks of Law Enforcement Training at the Florida Highway Patrol Training Academy in Tallahassee, Florida. Recruits are compensated $4,166.67 per month. Meals, lodging, training materials and physical fitness training are provided. Florida Certified Law Enforcement Officers receive eight – nine weeks of Transitional Law Enforcement Training. Currently Certified Law Enforcement Officers with two or more years of experience in patrol operations receive four weeks of in-service style training. Meals, lodging, equipment, physical fitness training, and study materials are also provided. All new hires will purchase training uniforms upon arrival at the FHP training academy.

16.     FHP maintains a "requirements" page within its website indicating the requirements that Ms. Smith was obligated to satisfy in order to apply to and attend the Academy.

17.     A very important aspect of the qualifications to become a state trooper, the qualification that is the most impactful on the issues raised in this lawsuit, is the following:

**WHAT IS THE SELECTION PROCESS?**

Selection is a three-to-six-month process that consists of the following:

- Completed State of Florida Employment Application.
- Successful completion of the Florida/Criminal Justice Basic Abilities Test for Law Enforcement (not applicable to applicants who possess active Florida law enforcement certification.
- Completed FHP Supplemental Application.
- Successful completion of the Physical Abilities Test.
- Polygraph Examination.
- Psychological Examination.
- Medical Examination.
- Vision Examination.
- Drug Testing.
- Fingerprinting.
- Background Investigation.

All out-of-state applicants may be required to make multiple trips to Florida to complete the selection process.

**For additional information about pursuing a career with the Florida Highway Patrol, visit** www.BeATrooper.com **or contact the Recruitment Coordinator by telephone at  1-850- 617-2315 or by E-mail at** BeATrooper@flhsmv.gov
**The Florida Highway Patrol is a division of the Department of Highway Safety & Motor Vehicles.**

18.    Ms. Smith satisfied all the above requirements and was admitted into the training academy on October 21, 2019, which was the start date of her employment for FHP.

19.    Ms. Smith was never diagnosed with any type of medical condition or malady that would disqualify her from attending the Academy or from employment with FHP.[1]

20.    FHP had full access to Ms. Smith's medical records and history at the time that she applied to the Academy.

21.    Likewise, FHP had the opportunity to conduct, and did conduct, its own independent medical examination and evaluation of Ms. Smith to decide whether she was medically, mentally, and physically qualified to attend the Academy and be employed by FHP upon completion of her training.

---

[1] Ms. Smith performed her medical exam for FHP on June 12, 2019.  She tested positive for Lyme Disease on July 18, 2019.  After testing positive for Lyme Disease, she was prescribed antibiotics and was informed by the Doctor that no further treatment was needed.

22.    Ms. Smith completed her training at the Academy and began working full time for FHP in March 2020.

23.    Ms. Smith's employment record with FHP demonstrates that she was an exceptional employee with no history of discipline.

## FACTS GIVING RISE TO THE CLAIMS IN THIS LAWSUIT

24.    Upon completing her training at the Academy, Ms. Smith was assigned to work for FHP Troop D at its Orlando Division located at 133 South Semoran Boulevard, Building A, Orlando, Florida 32807.

25.    Ms. Smith was assigned to work under the command of Sergeant Christopher Durrance and Captain Sanchez .

26.    Ms. Smith's work experience was routine and functional up until December 2021.

27.    At the time, Ms. Smith was in a romantic but abusive relationship with Echeverria, who was also a trooper for FHP and graduated from the Academy in the same class as Ms. Smith.

28.    Ms. Smith was experiencing some headaches and occasional dizziness during the late fall of 2020, which she assumed was the result of allergies as she never had a history of, or been diagnosed with, a medical condition that would lead her to conclude otherwise.

29.    As FHP and the Academy established before Ms. Smith attended the Academy, Ms. Smith was healthy before attending the Academy and met the physical and mental qualifications required for the position.

30.    Echeverria, in his effort to further manipulate and control his domestic partner, forced Ms. Smith to report her headaches to FHP.

31.    Echeverria used his undue influence and power over Ms. Smith to convince her that she had seizures and had to disclose this un-diagnosed condition to their Captain.

32.    Ms. Smith personally had no true reason to believe that she had experienced a seizure but thought that it made sense to speak with her supervisor since she had nothing to hide.

33.    Upon information and belief, Echeverria wanted to use this as yet another opportunity – Ms. Smith's disclosure of a medical condition (undiagnosed or otherwise) – to manipulate, control and abuse Ms. Smith, and he knew that his friends – Carter, Sanchez and Ellis would support this quest.

34.    As such, on November 3, 2020, Ms. Smith met with Ellis, Echeverria and a third trooper to discuss her concerns about depression and anxiety.

35.    During that conversation, she expressed her concerns about the headaches, depression, and anxiety – which Echeverria forced her to do.  Ms. Smith mentioned that a friend (a non-medical professional) told her that she could be

having "focal point seizures" so she wanted to see a doctor to confirm that she was not having focal point seizures. Ellis immediately jumped to the wrongful conclusion that Ms. Smith was suffering from seizures, without any medical evidence to support the assumption, and initiated a quasi and self-serving investigation which enabled FHP to terminate her.

36. FHP unilaterally decided that Ms. Smith had suffered from focal point seizures, without having the requisite medical evaluation and evidence to support this assumption.

37. In fact, FHP was not concerned with obtaining this evidence since the objective of this quasi-investigation or witch-hunt was to get rid of Ms. Smith, not to determine whether she truly had a medical condition that could disqualify her from performing her job responsibilities.

38. Focal point seizures, also called focal seizures, begin in one area of the brain, but can become generalized and spread to other areas. For seizures of all kinds, the most common treatment is medication. A physician may also recommend diet therapy, nerve stimulation or surgery, depending on the seizures' characteristics.

39. Focal seizures are most common in people who have head injuries, birth abnormalities of their brain, febrile seizures in childhood, infections of their brain (encephalitis), strokes, brain tumors or other conditions that affect their brain.

40.     Focal seizures are a type of seizure that affects only one side of your brain and body. These seizures tend to be less severe than generalized seizures, which affect both sides of your brain and body. Focal seizures are the most common type of seizures with epilepsy, and are often seen with conditions like stroke, head injuries and more.

41.     A healthcare provider, usually a neurologist, can diagnose focal point seizures based on the symptoms of the patient and performing diagnostic tests. These tests can usually confirm if you had a seizure and whether it was provoked or unprovoked. Genetic tests can also uncover inherited conditions that cause seizures.

42.     A key part of diagnosing focal seizures is finding the focal point, a specific area where the seizure(s) started. Locating the focal point can greatly help with treating focal seizures.

43.     The type of tests utilized by physicians to diagnose a focal point or any other type of seizure, include:

   a.  Blood tests (these look for metabolic and blood chemistry imbalances, immune system problems, toxins and poisons and check levels of antiseizure medications).

   b.  Electroencephalogram (EEG).

   c.  Video-EEG monitoring.

   d.  Magnetic resonance imaging (MRI).

   e.  Positron emission tomography (PET) scan.

   f.  Ictal single-photon emission computed tomography (SPECT).

    g.  Magnetoencephalography (MEG).

    h.  Intracranial EEG monitoring with subdural electrodes, depth electrodes or Stereo-EEG (SEEG).

    i.  Spinal tap (lumbar puncture), when your provider is concerned that the epilepsy is caused by an infection or immunologic brain disease (a disease where your body's own immune system attacks various parts of the brain).

44.    Providers might also recommend other tests to determine if the person experienced any kind of injury, side effects or complications from a seizure.

45.    It is recognized and understood that a healthcare provider (a neurologist in particular) is the best person to diagnose a focal point seizure and make the appropriate recommendations for testing and treating the condition.

46.    Diagnosing and treating focal seizures starts with finding out if they are provoked or unprovoked. When possible, treating the underlying cause of provoked seizures can often stop seizures from happening. If the underlying cause is not treatable, healthcare providers will usually try to treat the seizures, so they are less severe or happen less often.

47.    The treatments for focal seizures vary widely. For provoked seizures, the treatment almost always depends on the cause. The treatment for unprovoked and epilepsy-related seizures depends on the type(s) of seizures, why they are happening and which treatments work best.

48.    Possible treatments for seizures due to epilepsy include:

a. Medications. Different medications can stop seizures as they happen, and other kinds can prevent seizures or make them happen less often. Some are intravenous (IV) medications treat seizures as they happen. Other medications are a pill the patient can take daily.

b. Diet changes. Low- or no-carb (ketogenic) diets can sometimes stop epileptic seizures entirely or reduce how often they happen.

c. Epilepsy surgery. Surgery can sometimes stop seizures by removing or disconnecting the problem area from the rest of the brain.

d. Vagal nerve stimulation (VNS). Electrical stimulation of the patient's vagus nerve, which connects directly to your brain, on its left side can help reduce how often seizures happen.

e. Responsive Neurostimulation (RNS). This is a system whereby a device detects ongoing epileptic activity in your brain and delivers electrical stimulation directly to the region of your brain generating the epileptic activity. The RNS device can lower your seizures over long periods of time.

f. Deep brain stimulation (DBS). This treatment uses a device implanted into your body with wires connected to specific parts of your brain. The device delivers a mild electrical current, which interferes with the electrical malfunctions that happen with seizures.

49. Assuming Ms. Smith had an actual seizure, the condition is clearly treatable and would not disqualify her from performing her job duties if a reasonable accommodation was made.

50. Ms. Smith had never been diagnosed by a qualified medical professional with a medical condition that would remotely suggest that she suffered from seizures or would suffer a seizure in the future.

51.     Furthermore, Ms. Smith never received a diagnosis from a qualified medical professional that would support the conclusion that she had a medical condition that would disqualify her from attending the Academy or performing her duties as a trooper.

52.     Surprisingly, Sanchez and Ellis allowed Echeverria to participate in this "investigation," and to provide his input about Ms. Smith's medical condition, knowing that his participation presented a conflict of interest.

53.     The male dominated leadership group in FHP Troop D decided that Ms. Smith needed to be terminated one way or another; it is likely that the leadership in Troop D wanted Ms. Smith gone to protect Echeverria, as people knew he was abusing Ms. Smith – Troop D did its own investigation of the abuse allegations but decided to retain Echeverria even though physical abuse generally rises to the level of a crime.

54.     FHP decided that Ms. Smith needed to immediately go on leave to be examined and medically evaluated to confirm their self-serving and unqualified medical theories about her health.

55.     Although Ms. Smith raised the issue of depression and anxiety, the Defendants chose to ignore those conditions to instead focus on forcing Ms. Smith to see a neurologist for a condition that FHP had no evidence she suffered from.

56.     Ms. Smith was forced to use all her paid personal time off, then she was put on leave without pay, then terminated.

57.     FHP has no rule, regulation, or policy that expressly states that a person who has had a seizure is immediately disqualified from holding a position with FHP, including a position as a trooper.

58.     Ms. Smith's employment file is completely devoid of any rationale, explanation, or definitive statement based on medical evidence or analysis about the "medical" condition (other than stating that she had a seizure) that formed the basis of FHP's decision to wrongfully terminate her employment.

59.     FHP was inconsistent about its reasons for terminating Ms. Smith.

60.     FHP and records from other Florida agencies show the following:

   a. Kimberley Ward signed a Florida FDLE Affidavit of Separation indicating that Ms. Smith was terminated on February 1, 2021, due to excessive absences, failing to report for duty, sleeping on duty, etc.  An issue that was never raised with Ms. Smith during the term of her employment.

   b. Other records indicate that Ms. Smith was never disciplined, and her termination had nothing to do with the issues in the Ward Affidavit of Separation, instead, they were solely due to her "medical condition".

   c. Other records indicate that Ms. Smith was dismissed for a "failed probationary period," but there is no information or evidence to explain or support the basis for this conclusion.

   d. Other FHP records indicate that Ms. Smith was terminated for failing to disclose a medical condition when she applied to the Academy.

61.    FHP decided to terminate Ms. Smith based on a perceived disability because Sanchez, Echeverria, and Ellis unilaterally decided, without any medical evidence or support, that Ms. Smith could not perform the duties required of her position, even though her record of performance did not indicate that she could not perform the job.

62.    Ms. Smith was told that she has no right to file a grievance or appeal of FHP's decision, and she had no right to exercise the rights and privileges afforded to other employees of FHP.

63.    In addition to discriminating against Ms. Smith based on a perceived disability, FHP, Sanchez, Echeverria, and Ellis took additional steps to destroy Ms. Smith's career.

64.    To provide example, Defendants wrongfully filed a complaint with the Florida Department of Motor Vehicles, that resulted in the suspension of Ms. Smith's driver's license.

65.    FHP's decision, coupled with the suspension of Ms. Smith's driver's license, negatively impacted her ability to obtain other gainful employment (including employment with another law enforcement agency), and prevented her from being able to transport herself, further putting her at the mercy of her domestic partner Echeverria.

66.    FHP had no qualified medical evidence to support their decision to terminate Mr. Smith based on a perceived disability, nor to wrongfully file a complaint with the Florida Department of Motor Vehicles; instead, it is obvious that this decision was made for the sole purpose of punishing Ms. Smith and tarnishing her reputation.

67.    To make matters worse, FHP also filed inaccurate documents containing false information with the Florida Department of Law Enforcement ("_FDLE_") stating that the basis for Ms. Smith's termination was excessive absenteeism, sleeping on the job, and other conclusions that had absolutely nothing to do with the reasons initially provided to Ms. Smith.

68.    FHP acknowledged the inaccuracy of the papers filed with FDLE but refused to take any action to correct her status; this decision has prevented Ms. Smith from obtaining a position with another law enforcement agency.

69.    Ms. Smith has retained the law firm of éclat Law, P.A. to represent her interests in this matter and is obligated to pay her attorneys a reasonable fee for their services and seeks this Court's intervention to award her reasonable attorney's fees and costs incurred as permitted by applicable law.

70.    FHP has waived sovereign immunity for situations where state actors, such as FHP, cause damages to persons for unequal treatment, discrimination, and the like pursuant to Florida Statute § 768.28(18) and applicable Federal law.

71.     All conditions precedent to bring this lawsuit have been satisfied, have expired, or occurred, or they have been effectively waived.

## COUNT I – DECLARATORY JUDGMENT

72.     Ms. Smith adopts and realleges the allegations articulated in paragraphs 1 through 71 above as if such allegations were restated in this claim.

73.     This is a cause of action seeking all remedies available to Ms. Smith under the Declaratory Judgment Act, 28 U.S.C §2201(a).

74.     A genuine issue and conflict exist concerning the medical condition, or disability, that forms the basis of FHP's unlawful decision to terminate Ms. Smith's employment, in addition to FHP's unlawful decision to deny her due process to appeal the unlawful decisions made by the Defendants.

75.     Specifically, Ms. Smith seeks the court's intervention to evaluate all available evidence to make a determination or declaration about the following issues:

> a. Whether Ms. Smith suffers from a disability that requires a reasonable accommodation.
>
> b. Whether FHP has the right to terminate Ms. Smith based solely on her having a disability.
>
> c. Whether Ms. Smith was entitled to a reasonable accommodation for her disability.
>
> d. Whether Ms. Smith failed to disclose a medical condition to FHP as stated in FHP's termination papers.

    e.   Whether Ms. Smith suffered a disability or some other medical condition that would disqualify her from employment with FHP.

    f.   Whether Ms. Smith suffered a disability or some other medical condition that justified FHP's decision to seek the suspension of her driver's license.

    g.   Whether FHP followed applicable law and its own policies and procedures in evaluating Ms. Smith's medical condition.

    h.   Whether FHP followed applicable law and its own policies and procedures in its decision to terminate Ms. Smith without affording her due process.

    i.   Whether FHP denied Ms. Smith due process afforded to her under both federal and Florida State law.

    j.   Whether FHP correctly reported the basis for Ms. Smith's termination with FDLE and whether it took all steps reasonably and lawfully required to make sure that the information was accurate and corrected to the extent is was not accurate.

    k.   Whether FHP violated Ms. Smith's constitutional rights both under the Constitution of the United States of America, and the Constitution of the State of Florida.

    l.   Whether FHP was justified in terminating Ms. Smith.

76.    Ms. Smith has no adequate remedy at law with respect to these issues.

WHEREFORE, KAILI ALEXIS SMITH requests that this Court award her all rights, remedies, and relief available to her under Declaratory Judgment Act, 28 U.S.C §2201(a) and the common law interpreting this statute.

## COUNT II – VIOLATION OF THE ADA

77.     Ms. Smith adopts and realleges the allegations articulated in paragraphs 1 through 71 above as if such allegations were restated in this claim.

78.     This is an action for violation of the Americans with Disabilities Act (ADA), 42 U.S.C. §12112 (Title I) against the Defendants for acts, omissions and resulting damages related to FHP's failure to accommodate Smith, her wrongful termination, and other unlawful employment practices to be proven at trial.

79.     FHP has waived sovereign immunity for situations where state actors, such as FHP, cause damages to persons for unequal treatment, discrimination, and the like pursuant to Florida Statute § 768.28(18) and applicable Federal law

80.     Further, FHP is a public entity as defined by the ADA in that it is an instrument of state or local government.

81.     FHP, as Smith's employer, is required to comply with the provisions of the ADA in terms of not discriminating against Smith based on a perceived disability and having to make a reasonable accommodation for a perceived disability.[2]

---

[2] FHP is a division of the Department of Highway Safety and Motor Vehicles ("FLHSMV"), which has two (2) ADA coordinators – an Internal ADA Coordinator to address any employee or employment issues and an External ADA Coordinator to address any customer, public, or facility related issues. *See* https://www.flhsmv.gov/ada-notice/.

82.     Smith is a qualified individual covered by the ADA as she has various disabilities, including but not limited to anxiety, depression, and other medical issues attendant to such maladies.

83.     In addition to depression and anxiety, FHP concluded (wrongfully or otherwise) that Ms. Smith was suffering from focal point or some other type of seizure—a conclusion and perception that the Defendants colluded with one another to reach without the benefit of medical evidence to support the conclusion.

84.     Ms. Smith's disabilities (perceived or otherwise), substantially limited her major life activities such as concentrating, thinking, communicating, and interacting with others. However, reasonable accommodations are available to persons suffering from such maladies.

85.     At all times material to the allegations in this complaint, Defendants were aware of Ms. Smith's disabilities (wrongfully perceived or otherwise), acknowledged them, and documented them as part of their scheme to unlawfully terminate her employment.

86.     Defendants, despite having knowledge and notice of Ms. Smith's disabilities, refused to provide a reasonable accommodation so that she could continue with her employment with FHP; instead, Defendants colluded with one another to unlawfully discriminate against her by terminating her employment without cause, in violation of federal and Florida state laws, including the ADA.

87.     In addition to failing to provide a reasonable accommodation and discriminating against a person with a known disability (perceived or otherwise), FHP unlawfully terminated Ms. Smith as a person with disability. FHP further denied Ms. Smith due process by not allowing her to avail herself of the grievance procedures provided by Florida law for employees of a public entity, in addition to FHP's own policies and procedures.

88.     At all times and places described herein, the actions and/or inactions of FHP were undertaken, and/or not undertaken, by individuals who were the employees or agents of FHP, each of whom were, at the time acting, within the course and scope of their employment. As a result, FHP is directly liable, or vicariously liable for said actions and/or inactions.

89.     FHP's wrongful and unlawful actions have caused Ms. Smith to suffer both economic and noneconomic loss, emotional distress, and pain and suffering because in addition to losing her job, FHP has wrongfully placed obstacles in Ms. Smith's way that prevent her from obtaining gainful employment with another law enforcement agency.

90.     Ms. Smith has suffered harm as a direct and proximate cause of the Defendants' acts and omission described above and she seeks a judgment against them, jointly and severally to the fullest extent permissible under applicable law.

WHEREFORE, KAILI ALEXIS SMITH demands judgment in her favor and against each of the Defendants, jointly and severally, for all damages available to her under Americans with Disabilities Act, 42 U.S.C. §12132 et seq., together with such further and additional relief this Court fully deems appropriate and permissible under the law.

## COUNT III – WRONGFUL TERMINATION

91.     Ms. Smith adopts and realleges the allegations articulated in paragraphs 1 through 71 above as if such allegations were restated in this claim.

92.     This is a cause of action for wrongful termination.

93.     Ms. Smith was a public employee within the State Personnel System as required by Rule 60L-36.005 of the Florida Administrative Code.

94.     Ms. Smith was advised that she was being terminated pursuant to the provisions of §110.227(1), Florida Statutes, which in relevant part provides (emphasis added):

> Any employee who has satisfactorily completed at least a 1-year probationary period in his or her current position may be suspended or dismissed only for cause. ***Cause shall include, but is not limited to, poor performance, negligence, inefficiency or inability to perform assigned duties, insubordination, violation of the provisions of law or agency rules, conduct unbecoming a public employee, misconduct, habitual drug abuse, or conviction of any crime***. The agency head shall ensure that all employees of the agency have reasonable access to the agency's personnel manual.

95.     Ms. Smith was likewise advised that she was being terminated pursuant

to Rule 60L-36.005(3) of the Florida Administrative Code, which provides:

> (3) Employees outside the permanent career service may be dismissed
> at will. Permanent career service employees may be suspended or
> dismissed only for cause, which shall include, but not be limited to, the
> following. Examples under the categories listed below are not
> exhaustive.
> (a) Poor performance. Employees shall strive to perform at the highest
> level of efficiency and effectiveness; they shall do more than "just get
> by."
> 1. Employees are expected to be reliable and dependable, for example:
> to show up for work, ready to work, on a reliable basis; to observe
> established work hours and scheduled appointments; to complete work
> on time; and to obtain permission before being off work and to schedule
> leave in a manner that minimizes work disruption.
> 2. Employees are expected to be effective, for example: to organize
> their work; to stay focused on job related activities during work hours;
> to provide the level of effort necessary to get the job done; to
> demonstrate willingness and ability to make decisions and exercise
> sound judgment; to produce work that consistently meets or exceeds
> expectations; to accept responsibility for their actions and decisions; to
> adapt to changes in work assignments, procedures, and technology; and
> to be committed to improving individual performance.
> (b) Negligence. Employees shall exercise due care and reasonable
> diligence in the performance of job duties.
> (c) Inefficiency or inability to perform assigned duties. Employees
> shall, at a minimum, be able to perform duties in a competent and
> adequate manner.
> (d) Insubordination. Employees shall follow lawful orders and carry out
> the directives of persons with duly delegated authority. Employees shall
> resolve any differences with management in a constructive manner.
> (e) Violation of law or agency rules. Employees shall abide by the law
> and applicable rules and policies and procedures, including those of the
> employing agency and the rules of the State Personnel System. All
> employees are subject to Part III of Chapter 112, Florida Statutes,
> governing standards of conduct, which agencies shall make available
> to employees. An agency may determine that an employee has violated
> the law even if the violation has not resulted in arrest or conviction.

Employees shall abide by both the criminal law, for example, drug laws, and the civil law, for example, laws prohibiting sexual harassment and employment discrimination.

(f) Conduct unbecoming a public employee. Employees shall conduct themselves, on and off the job, in a manner that will not bring discredit or embarrassment to the state.

1. Employees shall be courteous, considerate, respectful, and prompt in dealing with and serving the public and co-workers.

2. Employees shall maintain high standards of honesty, integrity, and impartiality. Employees shall place the interests of the public ahead of personal interests. Employees shall not use, or attempt to use, their official position for personal gain or confidential information for personal advantage.

3. Employees shall protect state property from loss or abuse, and they shall use state property, equipment and personnel only in a manner beneficial to the agency.

(g) Misconduct. Employees shall refrain from conduct which, though not illegal or inappropriate for a state employee generally, is inappropriate for a person in the employee's particular position. For example, cowardice may be dishonorable in people generally, but it may be entirely unacceptable in law enforcement officers. By way of further example, people are generally free to relate with others, but it may be entirely unacceptable for certain employees to enter into certain relations with others, such as correctional officers with inmates.

(h) Habitual drug use. Agencies shall not tolerate violations of Florida's Drug Free Workplace Act, Section 112.0455, F.S., or other misuse of mood- or mind-altering substances, including alcohol and prescription medications.

(i) Conviction of any crime, including a plea of nolo contendere and a plea of guilty with adjudication withheld.

96.     FHP, along with the individually named Defendants, colluded to terminate Ms. Smith's employment for cause (a manipulation and contrived termination), although having a disability does not constitute cause under §110.227, Florida Statutes or any of the provisions articulated in Rule 60L-36.005(3) of the Florida Administrative Code.

97.     In addition to wrongfully terminating Ms. Smith's employment, the Defendants denied her due process by not allowing her the opportunity to exercise her rights to appeal their decision pursuant to §110.227(1), Florida Statutes. In fact, FHP advised her expressly that she was not eligible for any administrative post-deprivation relief internally within FHP or through the State's various administrative procedures. As such, there was no State procedure adequate to remedy any procedural deficiency in the wrongful termination and discrimination that Ms. Smith suffered.

98.     Ms. Smith suffered both economic and non-economic loss as a result of the Defendants unlawful acts and omissions alleged herein, which acts and omissions constitute a direct and proximate cause of the damages for which Ms. Smith seeks to be compensated.

WHEREFORE, KAILI ALEXIS SMITH demands judgment in her favor and against each of the Defendants, joint and severally, for all damages and other relief this Court fully deems appropriate and permissible under the law.

## COUNT IV – VIOLATION OF THE FMLA

99.     Ms. Smith adopts and realleges the allegations articulated in paragraphs 1 through 71 above as if such allegations were restated in this claim.

100.    This is a cause of action for violation of the Family Medical Leave Act of 1993, 28 USC §2601, et seq.

101.   As alleged earlier in this Complaint, Ms. Smith, at the insistence of Echeverria, met with her superiors to discuss certain medical issues she had been experiencing, including depression, anxiety, and headaches, and to discuss her concern that it was her friend's suggestion to also be checked for *potential* focal point seizures. She did not believe these issues affected her ability to perform her job, but she wanted to share this information  with her employer in good faith.

102.   Defendants, either intentionally or negligently, jumped to the conclusion that Ms. Smith's "medical condition" posed a danger to herself and to others, and demanded that she take leave to seek a medical evaluation and clearance to return to work.

103.   Defendants, either intentionally or negligently, decided to use Ms. Smith's forced medical leave as an excuse to terminate her for cause stating that she had a medical condition that made her unfit to remain employed by FHP, while at the same time claiming to terminate her for excessive absence, sleeping on the job, and other things having nothing to do with the medical issues and disabilities that were the subject of discussion in November 2020.

104.   Ms. Smith was entitled to leave pursuant to 28 USC §2601(a)(1)(D).

105.   Defendants wrongfully and unlawfully terminated Ms. Smith in violation of Family Medical Leave Act of 1993, 28 USC §2601, et seq.

106.   Ms. Smith suffered both economic and non-economic loss as a result of the Defendants unlawful acts and omissions alleged herein, which acts, and omissions constitute a direct and proximate cause of the damages for which Ms. Smith seeks to be compensated.

WHEREFORE, KAILI ALEXIS SMITH demands judgment in her favor and against each of the Defendants, joint and severally, for all damages and other relief this Court fully deems appropriate and permissible under the law.

Respectfully submitted,

**éclat Law, PA**

/s/ *Kevin K. Ross-Andino*
Kevin K. Ross-Andino, FB# 66214
kevin.ross@eclatlaw.com
Jolynn M. Falto, FB#1002743
Jolynn.falto@eclatlaw.com
307 Cranes Roost Boulevard # 2010
Altamonte Springs, Florida 32701
Phone: (407) 636-7004.